## THE SATILLA.

(Circuit Court of Appeals, Second Circuit. May 9, 1916.)

No. 270.

1. MASTER AND SERVANT ⊚⇒316(1)—MASTER'S LIABILITY FOR NELIGENCE—INDEPENDENT CONTRACTORS.

A stevedoring company, which contracted generally to load and discharge the vessels of a steamship company at New York, the steamship company giving orders when and where to load or discharge a vessel, but not as to the manner of doing the work, was an independent contractor, for whose negligence the shipowner was not responsible.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1242; Dec. Dig. ⊚⇒316(1).]

2. MASTER AND SERVANT ⊚⇒321—MASTER'S LIABILITY FOR NEGLIGENCE—INDEPENDENT CONTRACTOR.

Where such contract required the vessels to furnish winches, but required the stevedore to keep them in repair and to furnish the winchmen, the responsibility for the use of a winch which had, to the knowledge of both parties, been defective for several years, was that of the stevedore.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1262; Dec. Dig. ⊚⇒321.]

3. MASTER AND SERVANT ⊚⇒301(4)—LIABILITY FOR NEGLIGENCE—SERVANT OF INDEPENDENT CONTRACTOR.

A winchman furnished by the stevedore under such contract, and who worked entirely under its orders, was a servant of the stevedore, which was alone responsible for his negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1213, 1214; Dec. Dig. ⊚⇒301(4).]

Appeal from the District Court of the United States for the Southern District of New York.

---

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit in admiralty by the New York Central & Hudson River Railroad Company against the steamship Satilla, the Texas City Steamship Company, claimant, with the Chiarello Bros. Company, impleaded. Decree for libelant against the Chiarello Bros. Company, and that company appeals. Affirmed.

For opinion below, see 221 Fed. 949.

McFarland, Taylor & Costello, of New York City (Willard U. Taylor and Alfred H. Strickland, both of New York City, of counsel), for appellant.

Barry, Wainwright, Thacher & Symmers, of New York City (James K. Symmers and Earle Farwell, both of New York City, of counsel), for libelant-appellee.

Burlingham, Montgomery & Beecher, of New York City (Charles C. Burlingham and Chauncey I. Clark, both of New York City, of counsel), for claimant-appellee.

Before WARD and ROGERS, Circuit Judges, and MAYER, District Judge.

ROGERS, Circuit Judge. This libel was filed by the libelant, as the owner of the lighter Samson and as the bailee of the cargo laden thereon and on behalf of the crew thereof, against the steamship Satilla, her engines, boilers, etc., and against all persons lawfully intervening therein, to recover damages for injuries which the Samson suffered on November 27, 1912, while at Pier 44, North River, New York City.

At the time this injury was done the Samson had been hauled alongside hatch No. 1 of the Satilla, to which she was made fast. The Satilla was being loaded with steel rails laden on the lighter Samson. The rails were handled by employés of Chiarello Bros. Company, stevedores. The rails were being hoisted on board the Satilla by means of winches and tackle owned by the Satilla and furnished by the owner to the stevedores and operated by the latter's employés at the time of the accident. The rails were taken from the pile on the Samson's deck and a chain sling was placed around them, three at a time, and hoisted from the Samson's deck until they were above the level of the steamship's rail, when they were swung on board by the Satilla's derrick and tackle and lowered into the steamship's hold. During the progress of the work three rails were negligently dropped from the sling when it was the height of the steamship's deck. They fell end-on to the deck of the lighter, piercing the deck and bottom of the Samson, and caused her to sink.

The rails, while being loaded into the steamship, were first fastened by an iron sling or chain around a draft of three rails in the usual way, which was as follows: By passing the sling chain twice around the rails, and crossing the hook end of the chain over the first turn of the chain, and engaging the hook with the suspended part of the chain, thereby causing the hook end of the chain to grip the first turn around the three rails to be hoisted. The sling or chain was placed around the rails about ten feet from one end thereof, so that when they were hoisted they stood or swung perpendicularly or somewhat diagonally.

The Texas Steamship Company, as the owner of the Satilla, filed its petition under the fifty-ninth rule in admiralty (29 Sup. Ct. xlvi) against the Chiarello Bros. Company. The petition states that the damages resulting from the fall of the rails were not due to any negligence on the part of the Satilla or those in charge of her, but were due to the negligence of Chiarello Bros. Company who were in charge of the unloading. The Chiarello Bros. Company allege that the accident was wholly caused by the defective winch of the Satilla, which they were directed and ordered to use by the Satilla, although it was out of order and out of repair to the knowledge of the Satilla before the accident.

[1] There is no doubt upon the testimony but that the Chiarello Bros. Company was an independent contractor. There was no relationship of master and servant between it and the Satilla. The Chiarello Company controlled the men engaged in loading and unloading the rails. The president of the Chiarello Company testified as follows:

"Q. Did you get orders from McMahon? A. I got orders from McMahon. Q. What orders did he give you? A. He gave me orders when he wants the cargo, how quick he wants the ship discharged or loaded, when the ship has got to go; if he wants us to work nights or days, and where he wants the cargo, he says. Q. In other words, he tells you when to work and where to work? A. He tells us when to work and where to work. Q. And how to work? A. No; not how to work; he says, 'This ship has got to be discharged night and day,' and we work night and day, Sundays or Sunday nights; and if he isn't in a hurry he says, 'We are in no hurry, and you needn't go to work day and night.'"

The McMahon referred to was the superintendent of the owner of the Satilla. Moreover the express contract entered into between the contractors and the company owning the Satilla provided as follows:

"The contractors at their own cost and expense shall:

"First. Supply all the necessary tools and gear to perform such services, with the exception of ships, winches, booms, falls and guys, hand trucks, and planks or skids, all of which are the property of the company and are loaned to the contractors, with the distinct understanding that same will be kept in proper repair and condition, and when damaged to the extent of being of no further use will be replaced by the contractors.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Fifth. Guarantee the company against any liability or claims arising by reason of accident or injury to the persons or employés of the contractors while such persons or employés are performing the services herein described either on board steamers or on lighters or wharves, particularly any injuries resulting from negligent or careless use of ship's gear.

"Likewise be responsible for any damage to the ship's hull, machinery, tackle, or gear, or to any other property, such as docks, lighters, or other floating equipment, that may be designated, owned, or used by the company, or their shippers or consignees, who may from time to time receive or deliver cargo.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"In accepting this agreement the contractors severally and jointly pledge themselves to strictly comply with its conditions, also to use every possible effort to protect the company's property and interests, as well as that of its shippers and consignees, to employ competent laborers and foremen, and to keep a constant watch on their men to prevent rough handling, breakage, pilferage, or any other damage to cargo."

[2] The winch which the stevedore used was not in perfect condition. The Satilla, which furnished it, was aware of that fact prior

to the accident. The stevedore also knew before the accident of its defective condition. Whether the winch was defective when it originally came into the possession of the stevedore does not appear with certainty, as the stevedore had been using it for a number of years and under its contract was bound to keep it in repair. However that may be, the stevedore cannot be excused because the Satilla furnished a defective winch and insisted on its being used. If the winch was unsafe when it was furnished, the stevedore was under no obligation to accept it, and should have declined to use it. And if safe when received, and it subsequently got out of repair, the stevedore was bound to repair it. The defect was that the winch would not at all times release, because of the inefficiency of the spring to move the drum back laterally on the shaft. When it failed to release, the person operating it would knock it loose by striking it with his hand or with a bar of wood or iron. The president of the Chiarello Company testified that the assistant engineer of the Satilla had said to him, when he complained about the winch, "The winch is all right," and "The only thing is that the drum don't release the winch, and then the thing is to bang it with a fishel; all they have to do is to knock them on the side of the drum, and they come back themselves; there is not much trouble about it."

Sometimes it was necessary to strike it five or six times before it would release, and sometimes one strike would release it; but when it was thus released the drum came back suddenly with a jerk. This trouble with the winch was not recent. The employé whose duty it was to give the signals to the winchman testified that "there was always something the matter with this winch." He was asked if the winch was used the day after the accident, and he said it was. He was then asked how it worked, and he replied:

"It always worked in the same manner; they were striking it, and it would then go back, and then they would stop again the work [to fix it]."

For several years it had always worked in the same way. The winchman was asked how long he had used this winch, and he said for six or seven years. He was asked then:

"Q. During those six or seven years did you have any trouble with the drum? A. There always was trouble. Q. What was that trouble? A. It was always the same thing, that the drum would not release."

He afterwards said that he had known the winch was out of order for three or four years. He further testified:

"Q. Will you tell the court how you operated this winch? A. When I received the order from the foreman, I would put on the steam and work the lever. Q. You worked the lever to do what? A. In order to start the working of the drum, and then as soon as the sling of rails was ready I would let her go, and would put my foot on the stop. Q. On this occasion, when the sling of rails fell, did the drum come back or release itself? A. No. Q. What effect did that have on the sling of rails when the drum did not come back? A. I was myself the cause of what happened; as soon as I saw that the drum did not come back, then I myself struck it with my own hand, and then this caused the chain to jerk. Q. What did you strike it with your hand for? A. In order to release the drum."

[3] The winchman was employed by the Chiarello Company and was its servant, and not the servant of the Satilla. In The Slingsby, 120 Fed. 748, 57 C. C. A. 52 (1903), this court held that a winchman was not the employé of the stevedore who had contracted to discharge and load the vessel. In that case the winchman was under the direction of the stevedore. But the contract there provided that the stevedore should furnish all labor and appliances, except winches and winchmen; and the captain of the vessel detailed a seaman to run the winch. As the stevedore had no power to discharge the winchman, and no power to require him to perform any other duty, or to substitute any person in his place, we held that he did not become their servant while in the service, but remained the servant of the ship, which was liable for his negligence.

In The Elton, 142 Fed. 367, 73 C. C. A. 467 (1906), the winch and the winchman were both furnished to the stevedores by the ship, and the Court of Appeals in the Third Circuit held the winchman was not the servant of the ship. It noticed the decision of this court in the Slingsby Case and said:

"We regret that we are not able to agree with the conclusions of law and fact reached by that eminent court. In a case like the present, we think the true test of fellow servant is whether both are, at the precise time of the accident, working in a common employment, under the same general control and direction. We think reason and the weight of authority supports this view."

The question came before this court again in Standard Oil Co. v. Anderson, 152 Fed. 166, 81 C. C. A. 399 (1907). In this case the injury resulted because a winchman reversed the winch before signal to do so was given him. The stevedore hired the longshoremen, but the ship furnished the winchman. The stevedore did not hire and could not discharge the winchman. The case was on all fours with the Slingsby Case, and was decided in the same way—that the winchman was not the servant of the stevedore. This court, speaking through Judge Lacombe, said:

"Our attention has been called to The Elton, 142 Fed. 367 [73 C. C. A. 467], in which the Circuit Court of Appeals in the Third Circuit reached a different conclusion upon a similar state of facts. We regret that we are not able to agree with the conclusions of law reached by that eminent court, but we see no reason to change the opinion heretofore expressed in The Slingsby, which was reached after careful examination of the authorities cited in The Elton."

The case was carried to the Supreme Court of the United States, and the authorities were considered at length, and the decision of this court was affirmed.

But the facts in the case at bar do not bring it within the rule this court laid down in the Slingsby and Standard Oil Co. Cases. The winchman was not furnished to the stevedore by the Satilla. He was by his own testimony employed by the Chiarello Company. That company had employed him for about eight or nine years. A witness was asked:

"Q. Who handled the winches when they were loading this cargo, the stevedores or men from the ship? A. The stevedores handle the winches. Q.

Have any men from the ship anything at all to do with the loading of the cargo? A. No, sir."

Another witness, second officer on the Satilla, was asked:

"Q. Who worked the winch? Do you know? A. Some of the longshoremen; I don't know who it was; probably the stevedore there (indicating) will tell you what man it was, I couldn't tell you. Q. Are you able to say on this occasion it was not a member of the crew of the Satilla? A. No, sir; it was none of our crew."

The chief engineer on the Satilla was asked:

"Q. Did you or your men have anything to do with the loading of the cargo? A. No, sir; don't have anything to do with the loading of the cargo. Q. Did you ever have anything to do with the running of the winch while the cargo was being loaded? A. No, sir."

There can be no question but that this winchman, selected by the stevedore company, employed by it, and subject to its orders, and who could have been discharged by it, was its servant, and, as it had exclusive control over him, it was answerable as his master for his conduct. The person in whose business another is engaged at the time, and who has the right to control and direct his conduct, is such person's master. The master is the one who has the control and direction of the servant, and whose will the servant represents, not merely in the ultimate result, but in the details of the work. 26 Cyc. 965. And the relation of master and servant does not exist between an employer (in this case the Satilla) and the servants of an independent contractor (the Chiarello Company), unless the former assumes control over the servant of the latter, and there is not the slightest evidence of that in this case.

Notwithstanding the testimony that for years there was trouble with this winch, because the drum stalled and was released by striking it, and that this caused a jerk unless the foot lever was used to prevent it, the evidence shows that no such accident as the falling of the rails from a sling had happened prior to this one. The winchman was asked whether he expected to have any trouble with the rails slipping out, and he answered that he did not anticipate it. The witness Terrance testified that he had never heard of any rail slipping until this occasion. Pelegrino testified that no such thing had ever occurred in his experience. Benfonti, a winchman who used this winch, stated that he had never known any cargo to slip, except in this particular case. Montanino had handled 20,000 or 30,000 tons of rails, and had never seen any slip out of a sling. The president of the Chiarello Company testified that he had never before had an accident in handling rails, and that he had no reason to expect that any accident like this would happen. He also stated:

"There was nothing very dangerous with the winch; the only thing was that it did not release it, and they had to go with a bar to knock it, or knock it with a fishel."

In view of the above testimony, and the further testimony that the sling of rails was properly made up in the usual customary and careful manner, there must have been negligence of some sort beyond and outside of the use of this winch. The conclusion to which we have

arrived is that the accident was caused by the failure, in this instance, of the winchman to use his foot lever when the drum of the winch was released by the winchman's blow. The expert, Campbell, a manufacturer of winches of 28 years' experience, called by the stevedore, testified that if the winchman "puts his foot on the brake it will stop the load and hold it there." The president of the Stevedoring Company, who had had many years experience in the business and was familiar with winches, testified that the drum could not move either way when you put the foot brake on. As we understand the evidence, the accident was primarily due to the failure of the winchman to have his foot on the brake.

As the injury was caused by the failure of the winchman to use the foot lever brake, a part of the mechanism provided for the purpose of holding as well as lowering the load, and by which the jerk could have been kept from being serious, the stevedore must be held responsible for the negligence of its servant.

The decree is affirmed.