LANCASHIRE SHIPPING CO. v. MORSE DRY DOCK & REPAIR CO., TOKIO MARINE & FIRE INS. CO. v. SAME. STANDARD OIL CO. OF NEW YORK v. SAME. STANDARD TRANSP. CO. v. SAME.

Nos. 10483, 11022, 10522, 10479.

District Court, E. D. New York.

July 1, 1930.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson and Richard F. Shaw, both of New York City, of counsel), for Standard Oil Co.

Hunt, Hill & Betts, of New York City (George Whitefield Betts, Jr., Edna Rapallo, and William R. Meagher, all of New York City, of counsel), for Lancashire Shipping Co.

Palmer & Furman, of New York City (Courtland Palmer and John K. Hartley, both of New York City, of counsel), for Morse Dry Dock & Repair Co.

CAMPBELL, District Judge.

The four above-entitled suits were on stipulation tried together, and are brought to recover damages caused by an explosion on board the steamship Egremont Castle, as follows:

The first suit is brought by the owner of the steamship Egremont Castle to recover its damages; the second by the Tokio Marine & Fire Insurance Company, Limited, under subrogation to recover for general average charges against the Takata shipment; the third, by the Standard Oil Company to recover damages to its shipment of oil and naphtha; the fourth, by the Standard Transportation Company to recover for damages to its barge Socony No. 251.

Morse Dry Dock & Repair Company is the respondent in each suit, and in the second above-entitled suit the Lancashire Shipping Company, Limited, was on the petition of the respondent Morse Dry Dock & Repair Company impleaded under the Fifty-Sixth Rule in Admiralty.

On the day in question the respondent, Morse Dry Dock & Repair Company, under contract with the owner thereof, Lancashire Shipping Company, Limited, the libelant in the first above-entitled suit, was engaged in making repairs on the steamship Egremont Castle.

The vessel had left the yard of the respondent, Morse Dry Dock & Repair Company, and was lying at Pier 37, Atlantic Dock, on the afternoon of June 24, 1924, and agents or servants of the respondent were performing the work of burning a hole, with an oxy-acetylene torch, between the after peak tank and the tunnel recess, for the purpose of installing a drain cock from the after peak tank into the tunnel recess.

The installation of the drain cock aforesaid had been ordered by Mr. Fairbairn, of Esplen Sons & McNaught, under whose inspection and supervision the contract was being performed, and authorized by Mr. Komp, the representative of the respondent, the installation of said cock being item 40 of extra work, not included in the original

752

contract; that being the method pursued as to extra work on the vessel.

The vessel, to respondent's knowledge, had already loaded cases of gasoline, which were stowed in the lower No. 4 hold, and at the time of the first explosion was engaged in loading cases of naphtha in No. 4 'tween decks from barge Socony No. 251, which was lying alongside No. 6 hatch.

There was other cargo aboard the vessel consisting of machinery owned by Takata Company, and also a shipment of wax and oil in drums.

The vessel had four holds and 'tween decks and six hatches.

About 3:10 o'clock p. m. on June 24, 1924, an explosion occurred in the after part of the vessel, and two men, dunnage, a truck, and blind beams in the 'tween deck hatch came up from the No. 6 hatch.

Other explosions and fire occurred causing damage to said vessel and cargo.

■ The fact that there was an explosion at the time in question is not denied, but that fact alone would not be sufficient to warrant a recovery against Morse Dry Dock & Repair Company.

To sustain a recovery against the respondent in each suit, Morse Dry Dock & Repair Company, it must be shown that negligence of the Morse Dry Dock & Repair Company was the proximate cause of the explosion.

The libelants contend that the explosion occurred as a result of a spark, negligently caused by respondent's agents or servants in using an acetylene torch in burning a hole through from the inside of the after peak tank into the tunnel recess, falling into the tunnel well where naphtha or gasoline and naphtha or gasoline vapor would find their way through a small hole or holes from the No. 4 hold into the tunnel recess, and causing a flash which was transmitted back through the said small hole into No. 4 hold, where the concentration of the vapor was such that an explosion of large proportions occurred in lower hold No. 4, causing the damage of which complaint is made in each of the several suits.

The respondent, Morse Dry Dock & Repair Company, contends that they were not guilty of negligence, and that the explosion was not caused by such a spark from the acetylene torch used by its agent or servant, but that the explosion was caused in the No. 4 'tween decks and not in the No. 4 lower hold, by the Lancashire Shipping Company,

Limited, its agents or servants, carelessly and negligently permitting a sling of cases to fall into the hold of the steamship Egremont Castle, or in carelessly and negligently causing to be used or using a torch aboard the steamship Egremont Castle.

The evidence is conflicting.

That the Egremont Castle was loading naphtha in cases in the No. 4 'tween deck, No. 6 hatch, from a lighter alongside at the time of the first explosion, and that an agent or servant of the respondent, Morse Dry Dock & Repair Company, was using an acetylene torch in burning a hole from the after peak tank to the tunnel recess, at the time of the first explosion, cannot be denied.

The steamship Egremont Castle was flying a red flag as a warning that she was loading an explosive cargo, and no one on the ship was smoking at the time.

But two possible causes for the first explosion have been mentioned, viz., a spark from the acetylene torch, or the falling of a sling of cases.

If the first explosion was caused by the spark from the acetylene torch, then it must have occurred in the No. 4 lower hold.

If the first explosion resulted from the falling of a sling of cases, then it must have occurred in the No. 4 'tween decks.

At the time of the explosion there were eleven men in the No. 4 'tween decks, Keller, a Standard Oil inspector, Murphy, the hatch boss, and nine stevedores. The Standard Oil inspector and four stevedores were killed in the disaster. Egenes (known as Olsen), one of the stevedores, died in the hospital shortly after the explosion, and another stevedore, Bloomquist, died prior to the trial. Murphy, the hatch foreman, Louis Larsen, John Young, and Jerry O'Brien, stevedores, who were in the No. 4 'tween decks, were witnesses at the trial.

From the fact that they are still alive, as well as from their testimony and that of the witnesses who were on deck, John Stange (referred to as John Strang), relief gangwayman, Paul Spillane, extra man, William Fuerst, slingman, Tito Suo (known as Ironhead), gangwayman, John Lombardo, winchman, Captain Cann, and Chief Officer Williams, I am convinced that on the first explosion two men, wood, trucks, and cases, and blind beams in the 'tween deck hatch, weighing about 850 pounds each, came up above the deck and at least one was found on deck, and that the first explosion occurred

in the lower No. 4 hold and not in the 'tween decks.

This opinion was greatly strengthened by the testimony of the witness John Stange, an intelligent and observant man, who certainly was not laboring under excitement but performed a manly and courageous part by remaining in a place of danger and continuing to play a stream of water from a hose on the ladder, so as to enable any one who might be alive to find their way by ladder to the deck, and whose opportunity for observation was of the best.

I reject the theory advanced by the respondent's expert witnesses that the presence of the beams on deck may be accounted for by the force of an explosion in the 'tween deck above them, which would cause the beams to bend downward in the middle, and that when that force was removed, they would spring back and rebound with such vigor as to project them upon the deck. These beams were 24 inches deep, and the sockets in which the beams rested, which were secured by three-quarter inch rivets to the coaming of the hatch, would certainly have been carried away if any such force of an explosion had occurred above the beam.

Respondent contends that the fact that the whole 'tween deck hatch was not blown off sustains the theory of its experts that the first explosion occurred in the 'tween deck, but that does not seem to me to be so, for the reason that the portion of the hatch that was lifted up was the portion of the hatch on which the covers had been loosely placed in anticipation of the completion of the loading of the lower hold, and therefore offering the least resistance.

The evidence clearly shows that flames first came from the lower hold and not from the 'tween deck, and the fact that both the main deck and 'tween deck was buckled does not prove that the first explosion occurred in the 'tween deck.

The testimony of the men in the 'tween decks who survived and appeared as witnesses on the trial is entitled to greater weight than expert testimony, as they were eyewitnesses.

The four survivors of those who were in the 'tween decks at the time of the explosion, Murphy, Larsen, Young, and O'Brien, were called as witnesses and stated positively that no cases fell, and they were not shaken on cross-examination. They are also corroborated by the testimony of Stange, Tito Suo (Ironhead), Lombardo, Fuerst, and Paul Spillane, who were on the main deck, and Castagna, Wood, Conti, Duffy, and McAuliffe, who were on the lighter Socony No. 251, no one of whom saw any evidence of any cases loose in the sling, nor did any of them see or hear any cases fall.

The respondent, in support of the contention that they fell, offered the testimony of Wilson, taken on commission in England, and the testimony of Mulligan, Donovan, McAlonan, and Avril, who were called as witnesses on the trial. Mr. Wilson was the wireless operator of the steamship Bowes Castle, which was docked at Pier 38 on the opposite side of the slip, and testified that he went aboard the Egremont Castle to visit the wireless operator, Jarrett, and stayed and talked with him for one-half hour or so. He then left the wireless room and walked along the deck and through the port alleyway and down on the deck where they were loading.

He then describes what he says he saw happen, but his description is so much at variance with what he said he saw happen when he testified on a commission a year before, and what he wrote in November, 1926, that I am convinced that he is mistaken.

Prior to the taking of his testimony by commission for this trial, there is nothing to show that he ever claimed to have seen the cases fall, and if he could have seen 6 or 8 feet below the hatchway, and the cases tumbled out, then there could have been no crash as there was a space of but 9½ feet between the main deck and the 'tween decks, and the loading platform was raised to the height of a case above the 'tween deck, and the distance the case could have fallen was too small to have caused a crash.

Mr. Mulligan said that he was 4 feet from No. 4 hatch when a draft of cases came up, and as it got over the hold one fell out, followed by the rest, and that there was a man there that had his hand up and said "stop."

Not only did no one see Mr. Mulligan there, but the cross-examination of Mr. Mulligan convinces me that he was in error.

Mr. Donovan did not say that he saw any cases fall into the hold, and his cross-examination shows that he was in error on some vital points.

Mr. McAlonan was a new witness, not having been called on any of the other trials.

He had been working off and on for the Morse people since 1892, and since the explosion for about one-third of the time, and had never told any one connected with the Morse people about seeing the draft of cases

fall, and was never asked about it at all until "I told a gentleman who came to my house looking for me last Friday night." He did not know how this gentleman came to get his name.

The steamship Bowes Castle was moored at Pier 38, across the slip from the steamship Egremont Castle, and McAlonan said that he came up on the after deck on the starboard side of the Bowes Castle and turned toward the Egremont Castle, out of curiosity; that there was a draft of cases of oil going up the side of the ship, and as it passed over the side of the ship, two or three cases came loose, and as it swung over the hatch they fell off. He did not know whether they fell into the hold. The only noise he heard was the explosion, he was too far away. He did not see the draft itself lowered into the hatch, it disappeared from view, and he did not know how low it went, it disappeared from his sight.

That the cases were not in the draft at the time the draft disappeared from his view; that the cases had fallen from the draft before it disappeared from his view.

Mr. Avril, a new witness who had not testified in any of the other trials, was called. He said that he had worked for the Morse people for a couple of years after the explosion, and had not told anybody in the Morse Company about seeing the cases slip until "last Friday morning when they called me up." He denied knowing about the cases for the men that were killed; said that he didn't see anything in the papers about it; that he worked there for two years for this company and did not know about it; that he never told a soul about seeing the cases slip until Friday when they called him up; that neither Mr. Bouvier nor Mr. Byrne ever talked to him about it; and that he was never asked to give a statement or affidavit or to come to court.

He said that the draft had started to go down and had gone down about a foot before the cases fell out, so that it was within 3 feet of the top of the hatch. He further said that he is now working for the United Dry Dock Company, which is successor to Morse, and has the same bosses as when at the Morse yard. That he had worked for Morse or the United Dry Dock ever since this accident happened; that it seemed to him that the falling of the cases was connected with the explosion, and that he had been a witness to an important fact. That he never knew that Morse was being charged with the responsibility for the explosion.

I do not believe that the last two named witnesses are telling a deliberate untruth, however hard it is to believe they had remained undiscovered under the conditions of employment they described, but I do believe that their recollection, so long after the event, is faulty, and that what they really saw was not cases falling into the hatch from a sling, but cases falling back into the hatch after they had been blown into the air by the first explosion, as did Second Officer Jenkins of the Egremont Castle.

The testimony of the witnesses who were in the 'tween deck at the time of the explosion is entitled to much greater weight than any testimony offered on behalf of the respondent, because the men in the 'tween deck were eyewitnesses of all that transpired in the 'tween deck immediately preceding the explosion, and I accept as true their testimony that no cases fell into the 'tween deck before the explosion, and I so find.

If, however, there be error in that finding and cases did fall into the 'tween deck immediately preceding the explosion, they could not have caused the explosion.

No witness called, including the longshoremen, the superintendent of the stevedoring company, the hatch boss, all men of long experience, Mr. Campbell, of the Bureau of Explosives, with eighteen years' experience, and Dr. Beard, with seven years' experience in the Standard Oil Research Department, had ever seen or heard of an explosion caused by falling cases of gasoline or naphtha.

And not only did the respondent fail to produce any witness who had ever heard of an explosion caused by the falling of such cases, but even the experts called by it admitted that they had never known or heard of a fire or explosion caused by the falling of such cases.

Gasoline does not explode by detonation.

The following must be shown to sustain the theory of an explosion caused by cases falling into the 'tween deck:

A spark must have been created.

Opportunity must have been afforded for contact of the spark with the gasoline vapor already within the explosive limits, and of sufficient volume to create a violent explosion.

Respondent's experts advance three theories as to the creation of the spark.

First, by the nails in the cases hitting steel, either on the ladder or on other nails of cases.

The cases were being landed too far forward of the ladder; and even if the cases

had left the sling in mid air, they would have carried athwartship and not aft to the ladder, and that theory cannot be sustained.

The nails were soft wire nails, and judging by the photograph they were countersunk, and as what generally happens when a nail is driven into soft lumber is that it countersinks itself, there was small chance of the nails in different cases striking each other and causing a spark.

Even if such spark could have been created by the nails hitting together, it would not have lasted long enough for the cases to break open, the tins to smash, the liquid gasoline to flow out, and an explosive mixture to form.

Second, by means of static electricity caused by the bursting of some cans, and as the cans burst the squirting out of gasoline.

To get the spark by static, the gasoline must have grounded on some metal part of the ship.

None of the gasoline charged with static flowing out of one of the bursted cans could have come into contact with any metal part of the ship for a considerable length of time, because the platform of wooden boards, upon which the cases were being loaded, covered the steel hatch coamings.

I am convinced that you could not get static without grounding, nor a spark with a difference of potential of a fraction of a volt.

Even if a static spark could have been produced at that time, the poorest time in the year to get static electricity, it would have been impossible for the spark to remain long enough for a sufficient quantity of gasoline to escape and vaporize.

Third, by means of a spark created by the rubbing of the cases together or sliding over the dunnage on top of the hatch.

The creating of a fire by rubbing two pieces of soft wood together is usually a slow job.

There was no evidence offered to show a temperature of over 100 degrees Fahrenheit, nor that the sun was shining on the 'tween deck hatch.

I am convinced that the fire could not have been caused by a falling case rubbing over the cases it fell on, or sliding over either the dunnage or top of the hatch, for the short distance this was possible, or that ignition if possible by such means would be instantaneous.

The cases did not fall, but even if they did, the violent major explosion which took place was not occasioned by such fall.

On Friday, June 20th, and Saturday morning, June 21st, 9,999 cases of Socony motor gasoline had been stowed in the No. 4 lower hold of the steamship Egremont Castle, the cases being built up fore and aft and in the wings, but leaving an open space under the square of the hatch large enough to hold about 5,000 cases more, and the main deck hatches had been put on and covered with tarpaulins, and the ventilators leading into this hold covered with canvas covers.

In this condition the hold was left undisturbed until the following Tuesday morning, June 24th, when the 'tween deck hatches and dunnage were put on, being finished by noontime.

When three of the stevedores arrived on Tuesday morning, they removed two or three of the main deck hatch covers and went down into the 'tween deck, and then smelled a strong odor of gasoline coming from the lower hold. The odor of gasoline indicates the presence of gasoline vapor, and there is always a percentage of leakage from cases of gasoline.

Care is used to prevent the loading of leaking cases and when discovered they are returned to the lighter, but even when loading there is some leakage.

Respondent makes a point of the fact that some of libelant's witnesses did not smell a very strong odor of gasoline, but this does not seem to me to be of great importance, because there was an odor of gasoline while the vessel was being loaded, and after smelling the odor of gasoline for a time the sense of smell thereof becomes less acute.

I have found that the first explosion occurred in the No. 4 lower hold and not in the 'tween deck, and the effect of the explosion indicated that there had been a considerable quantity of gasoline vapor in the lower hold.

Libelant contends that some of the gasoline which had leaked, or gasoline vapor that had formed in the lower No. 4 hold, found its way into the tunnel or tunnel recess, and being heavier than air, sought the lowest level and found its way thereto, which was the tunnel well.

For this to have happened, of course, there must have existed some opening through which the gasoline or vapor could find its way from the lower No. 4 hold into the tunnel recess.

Respondent makes a point of what it terms the "unseaworthiness" of the ship, if there were holes through which gasoline or vapor could pass into the tunnel recess.

This does not seem to me to be so, because it is a well-known fact that gasoline or vapor will find its way where water will not, and the shaft alleys of a cargo vessel such as the Egremont Castle are constructed to be water tight, and not required to be gasoline tight or vapor tight. This is not a case of a deep tank in which oil is loaded in bulk, but of a cargo hold in which cargo is loaded in containers, and it is sufficient if the shaft alleys are water tight to the extent that no more water will enter them than can easily be taken care of by the pumps. When vessels such as the Egremont Castle are built, the tunnels are subjected only to a hose test, not a pressure test, and it is not the practice, nor does Lloyds require it, that they should have subsequent water tests.

Respondent also contends that there could not have been such openings, because by the testimony of the officers of the ship it appears that no such holes had been in existence before the first explosion. This contention does not appear to me to have been sustained, because some of the holes would not have been easily discoverable and would not show simply by the shining through of light.

The special No. 3 Lloyds survey to which attention is called by the respondent was held at Shanghai, in August, 1923, and subsequent thereto the Egremont Castle started on a voyage, making various ports, which ended at New York in June, 1924, where she discharged and was loading another cargo for another voyage when the explosion occurred.

Tunnels are necessarily constructed of a shape that makes them less rigid than a flat bulkhead and are subjected to heavy blows when loading and discharging cargo. On the tunnel in question the crown plates came down inside the plates forming the sides, and at their base the side plates are joined to the tank tops by a bounding angle or foundation bar.

The tunnel recess extended 14 feet 6 inches forward of the after peak bulkhead, and the shelf upon which the spare tail shaft rested extended 7 feet forward of the recess proper. While not definitely fixed in the testimony, it appears from the plan and photographs that about one foot forward of the forward end of the recess proper, and over that portion of the tunnel where the shelf for the spare shaft bulges out on the port side

of the vessel, the ventilator or tunnel escape entered the tunnel. A row of iron ladder steps were riveted into the plates of the tunnel a few feet forward of the forward corner of the shelf. Filling the entire space under the recess, extending fore and aft and athwartship, was the tunnel well which was covered with a loose flooring of wooden boards extending forward the length of the tunnel to furnish a place for the men to walk.

The No. 4 hold well, which takes the drainage from the bilges in No. 4 hold, was under the 7-foot portion of the tunnel, directly forward of the recess, and a manhole covered by a steel cover dogged on, and a sounding pipe were openings from the well into the tunnel.

Three other apertures in the tunnel were found after the explosion.

The witness Norman testified that one of these, a hole located on the starboard side of the tunnel 3 or 4 feet forward of the forward corner of the shelf, he saw before the explosion; one of the ladder steps at this point being broken off but the bolt remaining in a condition that permitted him to shove it in and out with maybe one-eighth of an inch play all around.

Respondent attacks the testimony of the witness Norman and contends that he is discredited by the testimony of the captain, chief engineer, and Mr. Haight; but it seems to me that the positive testimony of the witness Norman, corroborated as he is by the witness Fairbairn, as to the bolt being slack and not tight after the explosion, is entitled to greater weight than merely negative testimony of the other witnesses I have named, which is strongest in showing that there was no hole in which there was no rivet.

The witness Haight discovered after the explosion a hole of about one-quarter to three-quarters of an inch in area in the corner of the shelf between the plates on the inside of the tunnel which went through into No. 4 hold underneath the shelf. The hole was caused by the failure of the flat plate and the other plates of the tail shaft shelf to meet. In his opinion this hole existed before the explosion.

The witness Haight is an experienced marine surveyor for whose opinion I have respect, and I believe he was correct in his opinion that this hole existed before the explosion, that it would be difficult to find except by careful inspection, that it would not be apt to draw one's notice, that it was below the level of the eye and occurred in a

rather complicated part of the ship's construction, and that it would be dark on the hole side even when the hatches were off.

Mr. Randolph, the photographer, in addition to finding the hole above described which was found by Mr. Haight, in taking a photograph in the tunnel and No. 4 hold, found another hole between the No. 4 hold and the tunnel.

The Egremont Castle at the time of the explosion was down by the stern, her draft forward being 9 feet 10 inches, and aft 15 feet 2 inches.

The hole discovered by Mr. Norman was one through which liquid gasoline could have flowed readily into the tunnel and found its way to the tunnel well, the lowest level.

Gasoline vapor could have entered the tunnel through the hole discovered by Mr. Haight.

The hole discovered by Mr. Randolph provided a means of access for liquid gasoline and gasoline vapor from the No. 4 hold to the tunnel where it would have found its way to the tunnel well.

The expert witnesses called on behalf of the respondent contend that if the gasoline vapor poured through any of the holes above described, it would have been physically impossible for a flash in the tunnel to have carried back to the hold and have caused an explosion under the 'tween decks hatch; because, if it was of sufficient concentration to pour through the holes, the density there at the hole would be so great as to extinguish the flash.

This contention is effectively overcome by the testimony of the experts called on behalf of the libelants, but more effectively overcome by the fact itself that although it is impossible to say with certainty through which particular opening the liquid gasoline or gasoline vapor found its way into the tunnel, yet it may have found its way through any one or all of them, and that it was there present in explosive mixture and set off by a spark from the torch; and this is conclusively proved by the fact that the witness Whitehead was burned while sitting on the spare tail shaft at the extreme end of the tunnel recess.

Whitehead was burned on one arm and the face. At the time Walsh, an employee of the respondent, was using the acetylene torch in burning the hole through the after peak bulkhead, and the sparks were coming through, when there was a loud report or shot and flames came through in front of Whitehead between him and the after peak bulkhead.

The flame did not come down the ventilator, but was caused by a spark from the acetylene torch setting off the explosive mixture in the tunnel well.

It does not seem necessary to discuss Whitehead's testimony, but I am convinced that the electric lights were lighted in the tunnel and that open flame torches were not used there. This disposes of the contention that the movements of men in the tunnel with open lights would have stirred up the vapor and ignited it and caused the explosion.

It is not necessary to discuss the respondent's contention that if the gasoline vapor had diffused through the holes, it would have been ventilated out by the tunnel ventilator, because the fact is that it was not.

That Whitehead and Jepson were not overcome by the fumes does not indicate to me that an explosive mixture of gasoline vapor could not have been present, because the vapor was heavier than air and was accumulated in the tunnel well below the wooden flooring which, though not closely fitted, would furnish adequate protection from cross currents of air and was below the level of the feet of men walking on the flooring, and it may well be true that Whitehead and Jepson told the truth when they said they were not conscious of the smell of gasoline, as gasoline vapor has an anesthetic action on the olfactory nerves.

There is no inherent impossibility in the libelant's contention.

Dr. Rogers, one of the respondent's expert witnesses, testified in regard to an explosion in an oil steamer, where one of the tanks blew up while the men were welding in it:

"The tank had been steamed out. In the lower part of the tank was a valve draining the tank, and during the steaming a lot of water condensed, a workman opened the valve to let the water out of the deep tank to the lower tank, and forgot to close the valve. The tank below had gas and it diffused through the hole into this section of the ship and the sparks eventually ignited it."

Dr. Jackson, one of the respondent's experts, testified as to an explosion of gasoline that took place in the sewer and raised the manholes all the way along Forty-Second street, and said: "I found there was a very large garage to the eastward there that was

washing most of their automobiles with gasoline and letting it run down into the sewer. That had been going on for a long time, but nothing happened, of course, because it did not get sparked off. You could get any concentration of gas in there, high or low, in the sewer, but of course it had to be ignited. Once in awhile something happens which ignites gas. This gas I am certain was ignited by a street car crossing the lower end of the line at 42nd Street right close to a manhole cover where the gas could diffuse and get ignited." When asked what part of the street car he thought ignited the gas he said, "The spark from the rail, a frictional spark," and further said: "There had been gas there right along, only the concentration was not right." Dr. Jackson agreed that when there was a proper concentration of the mixture and when it diffused up, then the explosion occurred.

Mr. Campbell, one of the libelant's experts, testified that if there is a gasoline vapor leading from a receptacle that has been running out of a receptacle, and you ignite the gasoline vapor at its extreme end away from the receptacle, it will flash right back to the source of supply. He told of a tank car blowing off through the safety valves and of going to help, and said: "I told him to run the tank under a water plug. The railroad employee went out on the ground and he signalled with a lamp to a man up on a locomotive coupled with some cars ahead to move the car, and as he brought the lamp down to make the signal, there was a flash. The flash traveled right along to the valve, and the fire burned at the valves at the top of the tank car." He also testified that tank cars had caused an explosion of vapor at Yardmore, Okl., where the ignition of the vapor occurred 300 feet from the source of supply, and at Memphis over 200 feet from the source of supply.

From all which it appears that where gasoline vapor is ignited at some distance from the point of origin, the flame will be transported back by the vapor to the point of origin, and if a mixture of sufficient concentration exists a major explosion will be caused.

The libelant's contention is sustained.

The torch was the cause of the explosion.

The use of the torch under the conditions described was an act of negligence.

As hereinbefore found, the respondent Morse Dry Dock & Repair Company was doing work aboard the steamship Egremont Castle under contract with the owners, and its employee Walsh, in performing item 40 of the extra work, was burning a hole in the after peak bulkhead with a torch, sparks from which caused the explosion.

The order for this item was given by Mr. Fairbairn to Mr. Chambers, the superintending machinist at the respondent Morse Dry Dock & Repair Company's yard on the morning of June 23d.

The evidence convinces me that the orders to burn the hole were given by Mr. Komp, who had charge for the respondent, Morse Dry Dock & Repair Company, of the repair work on the Egremont Castle, and were not given by Mr. Fairbairn; and, further, that the work could have been done with a ratchet and drill, and that the use of the torch was not necessary.

The contention of the respondent that Fairbairn gave the order to burn the hole when he was in the room of Chief Engineer Baxter in the afternoon, which was first advanced at this trial, is not sustained. I am convinced that Fairbairn not only did not at any time give instructions to burn the hole, but that he did not even give his approval thereof.

In any event, Morse Dry Dock & Repair Company, the respondent, represented by Mr. Komp, was solely responsible for the method by which it performed repairs, and Esplen Sons & McNaught, the supervising engineers, represented by Mr. Fairbairn, were only responsible for the result and that the work be completed satisfactorily, and not to instruct the respondent how to carry on its own business. Olson Water & Towing Co. v. U. S. (The West Nohno) (C. C. A.) 21 F.(2d) 304, 1927 A. M. C. 1581, reversing 1927 A. M. C. 42; H. & C. Grayson, Ltd., v. Ellerman Lines, Ltd., [1920] 123 Law Times Reports 65.

The use of the torch constituted gross negligence.

This is clearly shown by the evidence including the order or rule of the respondent on the subject of burning, and the allegation in the petition of the respondent in the second above-entitled action, and was not denied by any witness.

The danger of using the torch while loading is clearly shown by the fact that Captain Cann refused to allow the loading of naphtha to proceed on the day of the explosion until he had been assured by Mr. Komp that he had finished the work on the doubling plate and that there would be no more fires or

burners, and that he insisted that the part of the doubling plate which came opposite the No. 3 hold should be bolted on with tap bolts and not riveted, because he would not take the risk of using hot rivets through No. 3 hold, when there was gasoline loaded in No. 4 hold, even though there was no case oil or gasoline in No. 3 hold.

There are but two possible causes of the explosion suggested by the evidence, and I have found that the cases did not fall. This eliminated one of them.

The danger of using a torch under the conditions described is well known and should be guarded against, and on all the evidence it is clear that the first explosion occurred in the No. 4 hold, and that not only is the libelant's theory a reasonable one, but the evidence all points to the use of the torch as an adequate cause proximately existing in its negligent use for the ensuing loss. International M. M. S. S. Co. v. W. & A. Fletcher Co. (C. C. A.) 296 F. 855.

The libelants have borne their burden by showing that no other adequate or not merely speculative cause existed. The Strathdon (D. C.) 89 F. 374, 377.

International Mercantile Marine Co. v. Fels (D. C.) 164 F. 337, affirmed (C. C. A.) 170 F. 275, 277, 18 Ann. Cas. 18, seems to be in point, although the libel was dismissed on another ground. Hobbs, Wall & Co. v. Petterson (C. C. A.) 2 F.(2d) 594; Wabash Screen Door Co. v. Black (C. C. A.) 126 F. 721.

For the rule in the New York state courts, see Stubbs v. City of Rochester, 226 N. Y. 516, 124 N. E. 137, 5 A. L. R. 1396; Fitzgerald v. Brooklyn Institute of Arts & Sciences, 175 App. Div. 554, 162 N. Y. S. 625.

The existence of the apertures in the tunnel did not constitute contributory negligence, even if that defense could now be raised, based on their existence, which I believe it could not be as it was not so pleaded, as the tunnel of a cargo carrier is not generally required to be oil and vapor tight, but only water tight.

There is no warranty of seaworthiness in these cases express or implied, as the dispute is not between carrier and shipper.

The existence of the apertures was not negligence constituting a proximate cause of the explosion. There would have been no danger without the subsequent negligent act of the use of the torch, and such explosion was not the natural and probable consequence of the existence of such apertures, nor should it have been foreseen that any one would use a torch under such circumstances. Milwaukee & St. Paul R. R. Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256; The Milwaukee Bridge (D. C.) 15 F.(2d) 249.

The petition of the respondent, Morse Dry Dock & Repair Company, impleading Lancashire Shipping Company, Limited, in the second above-entitled action, must in any event be dismissed.

On October 13, 1926, a final decree was entered on the petition filed by the said Lancashire Shipping Company, Limited, claiming the benefit of the Limitation of Liability Statutes (Rev. St. §§ 4283 and 4285 [46 US CA §§ 183, 185]), wherein it was decreed that the defaults of all persons who had not theretofore presented or filed claims in said proceedings were entered and the prayers of the petition taken pro confesso against them, and that all claims which had not theretofore been presented should be forever barred, and the Lancashire Shipping Company, Limited, discharged from all liability in respect thereof, and that all persons were forever barred from prosecuting the same, and that said fire and explosions were occasioned and occurred without the privity or knowledge of the petitioner, and were not caused or contributed to by any negligence on the part of the ship or said petitioner.

In so far as said petition is concerned, the matters determined by the limitation decree are res adjudicata against the petitioner and it is forever barred from proceeding by said petition or maintaining the same.

Decrees may be entered in each of the above-entitled actions in favor of the libelant against the respondent, Morse Dry Dock & Repair Company, with costs and the usual order of reference, and dismissing the petition of the respondent in the second above-entitled action, with costs to the Lancashire Shipping Company, Limited, against the Morse Dry Dock & Repair Company.