CORNEC et al. v. BALTIMORE & O. R. CO. et al.

The RICHELIEU.

No. 3003.

Circuit Court of Appeals, Fourth Circuit.

April 13, 1931.

George Forbes and John H. Skeen, both of Baltimore, Md., and John C. Prizer, of New York City (Henry L. Wortche, of Baltimore, Md., Barry, Wainwright, Thacher & Symmers, of New York City, Louis J. Sagner, L. Wethered Barroll, Jacob E. Cohen,

Glick & Schlossberg, Harry H. Goldberg, Harry O. Levin, Briscoe & Jones, Herbert R. O'Conor, William H. Lawrence, and George T. Mister, all of Baltimore, Md., on the brief), for appellants.

George W. P. Whip, of Baltimore, Md. (Duncan K. Brent, of Baltimore, Md., on the brief), for appellee Baltimore & O. R. Co.

Emory H. Niles, of Baltimore, Md., and William P. Hurley, of Newark, N. J., for appellee Lewis Mfg. Co.

Before PARKER and NORTHCOTT, Circuit Judges, and GRONER, District Judge.

PARKER, Circuit Judge.

This is an appeal from a decree in admiralty dismissing libels filed against the Baltimore & Ohio Railroad Company for the recovery of damages sustained as the result of a pitch dust explosion alleged to have been due to its negligence. The libels were filed against the railroad company, which was engaged at the time of the explosion in loading a cargo of pitch into the French barque Richelieu. They were filed by the master in behalf of the owners of the vessel and the owners of the cargo, by certain members of the crew, certain stevedores employed by the railroad and by the personal representatives of certain stevedores who were killed in the explosion. It was alleged that the railroad company was guilty of negligence in creating a cloud of explosive dust while loading the cargo of pitch and in using open kerosene lights and machinery which emitted sparks and flashes of electricity in the dust thus created. The railroad company filed a cross-libel against the owners of the vessel, asking recovery for the damage done to its pier as a result of the explosion; and, under Admiralty Rule 56 (28 USCA § 723), it impleaded the Lewis Company, the manufacturers of the pitch, alleging that the pitch was of dangerous character, and that the manufacturers had negligently failed to give warning with regard thereto.

The District Judge dismissed all of the libels and the cross-libel. He found that the explosion was caused by the use of open lights in the cloud of pitch dust, but that the railroad company was not guilty of negligence, because the explosive character of the dust was not known and the company was not chargeable with knowledge thereof. For like reason, he dismissed the cross-libel against the owners of the vessel and dis-

charged the manufacturers who had been impleaded under the admiralty rule.

Although the record is voluminous and the briefs unreasonably long, the facts of the case are comparatively simple. The railroad company had transported the pitch over its railroad system from Fairmont, W. Va., and Chicago, Ill., to its terminals in Baltimore, and was engaged in loading it on the Richelieu when the explosion occurred. For this purpose it was using the loading devices which it had constructed for the loading of coal on vessels, consisting of a tower, a shuttle belt, a telescopic chute, and, at the bottom of the chute, electrically operated trimmers which changed the direction of the falling coal and threw it against the sides of the vessel. These loading devices had a tendency to break the pitch up, and, when they were in operation, resulted in creating a dense cloud of pitch dust. When coal was being loaded, a sprinkler system was used to keep down the dust; but, when the railroad company was loading pitch for another company some time prior to the explosion, objection was made to the use of the sprinkler system on the ground that water injured the pitch, and thereafter, when loading pitch, nothing was done to allay the dust. The loading apparatus had been in use for several years, and the electrical machinery used in connection therewith had become considerably worn, with the result that at a number of places it emitted sparks and flashes of electricity. Without going into a minute description of its condition, it is sufficient to say that the testimony establishes beyond peradventure that it was not fit for use in an explosive atmosphere.

The loading of the vessel was well advanced towards completion when the explosion occurred. All the work which could be done in the hold with the use of the mechanical trimmers had been completed, and they were being operated in the 'tween decks. Stevedores had been sent into the hold to complete the trimming there, and a number were working in the 'tween decks. These stevedores were given open kerosene lamps to furnish light while they were at work. The forward hatch had been closed, and a temporary bulkhead had been erected forward of No. 2 hatch, which confined the cloud of dust created by the operation of the trimmers. This dust cloud took fire, and the explosion resulted.

The learned judge below has found that the explosion was caused by the open lamps,

and it is clear that it originated either from these or from the mechanical trimmer which was operating in the 'tween decks at No. 2 hatch. We think that the evidence shows that it originated from the trimmer. Eyewitnesses, whom the judge found to be truthful, so testified; and the only substantial evidence to the contrary is the opinion of one of the experts. Direct evidence of an occurrence is, of course, entitled to greater weight than opinion evidence [Lancashire Shipping Co. v. Morse Dry Dock & Repair Co. (D. C.) 43 F.(2d) 750]; and we should hesitate to base a finding upon the opinion evidence here, which is opposed to the overwhelming weight of the testimony of eyewitnesses. It is not necessary to go into this matter, however, as the dust unquestionably exploded because of contact with a source of ignition for which the railroad company was responsible. The bringing of such source of ignition into contact with the dust was dangerous. The only question on this branch of the case is whether the company, in the exercise of ordinary and reasonable care, should have known that it was dangerous; i. e., that the dust was explosive. We think that this question must be answered in the affirmative.

Pitch is a carbonaceous substance more than 99 per cent. combustible and more than 50 per cent. volatile. Pitch dust is nothing but pitch in a fine state of subdivision. It is a matter of general and common knowledge that whatever will burn will burn more rapidly in fine subdivision, and that, granted a proper admixture of air, the finer the subdivision the more rapid the rate of combustion. A dust explosion is simply the exceedingly rapid and almost instantaneous combustion of myriads of small particles of solid matter held in suspension by the air. Not all dust clouds, of course, even of combustible material, are explosive, for to render them explosive there must be the proper admixture of air to supply the necessary oxygen; but it has long been known that, if the proper mixture with the air is obtained, any dust of combustible matter will explode, and that every precaution should be taken to prevent any source of ignition from coming in contact with it. Thus it was known that not only pitch dust and coal dust were explosive, but also that explosions were to be apprehended from the dust of grain, starch, cocoa, tea, rice, soya beans, malt, oat husk, cork, and other like substances. As said by the railroad company in its brief filed with this court in the case of Moore v. B. & O. Co., 37 F.(2d) 884, "the fact that carbonaceous or combustible matter in fine subdivision as dust floating in the air may form a highly dangerous or explosive mixture and has been the cause of numerous disastrous explosions has long been known.".

It may be true that the theory of the witness Patrick as to the mechanics of a pitch dust explosion was something new, although we are not satisfied either with the novelty or with the correctness of that theory; but certain it is that, whether the correct theory was held or not, the explosibility of pitch dust had long been known, and that is the fact of importance here. In the British Blue Book of 1914 it was stated: "Pitch dust was found to be more highly inflammable material than coal dust of the same degree of fineness and almost as dangerous as sugar." Practically the same statement is contained in Bulletin No. 167 of the United States Bureau of Mines published in 1922. A work on "Blacks and Pitches," published by H. M. Langton in 1925, stated that fatal explosions due to coal tar pitch had been recorded, and that "pitch dust is more highly inflammable than coal dust of the same degree of fineness." The United States Bureau of Mines, in a report in 1919 to the Aluminum Company of America, stated: "The inflammability tests conducted with the pitch dust indicate it is considerably more inflammable than standard Pittsburgh coal dust of about 200-mesh. Clouds of the material could be easily ignited with a bunsen burner flame, electric arc, candle flame, etc. This dust must therefore be considered as dangerously inflammable when mixed with air."

There is abundant evidence not only of pre-existing theoretical knowledge of the explosibility of pitch dust, but also of so many disastrous explosions due to it that any person engaged in handling pitch should have known of them. In 1871 there was an explosion of grahamite dust while a vessel was being unloaded in New York harbor; the explosion being caused by a workman's striking a match to light his pipe. Grahamite is natural pitch or asphalt. Other dust explosions had occurred from time to time in the asphalt mines of Utah and Oklahoma. A pitch dust explosion occurred at the Glasgow docks in the year 1914 while a vessel was being loaded with pitch and is reported in the British Blue Book of that year. The Blue Book for 1923 reports another such explosion. In 1924 there was a disastrous explosion of pitch dust at the plant of the Aluminum Company of America at Massena, N. Y., an account of which was carried by various

newspapers. It was also the subject of a special article in the Bulletin of the Department of Labor of the state of New York, which contained the following statement: "Laboratory tests and the above experience leave no doubts as to the explosibility of pitch dust, and unusual precautions should be exercised by all who handle it to minimize the damage resulting therefrom."

In the light of the occurrences and the articles to which we have referred, the contention that the explosibility of pitch dust was not known prior to the explosion on the Richelieu cannot be sustained. Not only was there information available as to explosions which had occurred, with opinions by experts and officials of government departments that pitch dust was explosive, but it also seems to us that, in the absence of such information, the railroad company, with its vast experience as a carrier of commodities, should have known that this cloud of carbonaceous dust was explosive, and that it was dangerous to bring a source of ignition in contact with it. The man on the street may not know the dangerous character of carbonaceous dust, but this carrier knew, or should have known it; and the records of this court show that shortly before the explosion it had built a great grain elevator at Baltimore, and, in constructing same, had used the utmost care to guard against the danger of dust explosions. It certainly seems that one who knows that grain dust will explode ought have no difficulty in concluding that pitch dust also is explosive. In this connection, it is shown by the record that, in a booklet by Price and Brown on "Dust Explosions," published by the National Fire Protection Association, a work which collated the knowledge of government officials on the subject, and with which the proper officials of the the railroad should have been and probably were familiar, the following standards of care were laid down for dealing with dust:

"Unless all the conditions which might possibly affect the inflammability of a dust are known it is difficult to state offhand what dusts are explosive, or whether a certain dust will explode or is dangerous. One broad principle which may be used as a guide in determining what dusts are explosive, or dangerous is that any dust from highly carbonaceous material or from any material that will burn may explode under proper conditions and is therefore dangerous from the explosion standpoint. The fact that coal dust is explosive has been brought out very forcibly by the large losses of life often accompanying a mine explosion. * * * That carbonaceous dusts are explosive is accepted as a theory by many men prominently identified with various industries, but they seem to feel that their particular plants are immune. It is not so long ago that some of the flour millers would say that they never heard of a dust explosion in a flour mill, while elevator men would say that they knew of the danger in flour mills, but most of them thought that elevator dusts contained too much field dirt to be explosive. However, since all carbonaceous dusts may explode, every possible precaution should be taken, not only in flour mills and elevators, but in every industry producing carbonaceous dusts, and, in fact, in other industries as well, for explosions of aluminum dusts have occurred, and there is one report of an explosion of iron dust."

With the general and common knowledge existent as to the explosive character of carbonaceous dusts in general, and with the information which the railroad might have obtained, and which it should have obtained when it held itself out as qualified to handle pitch, as to the explosibility of pitch dust in particular, there can be no question that it was guilty of negligence in operating sparking electrical machinery and in sending open lights into a cloud of such dust. This conduct was directly in violation of the standards of care in dealing with dust prescribed by regulations which had been in force in England and several states of this Union for a number of years, and, irrespective of regulations, was violative of the standards of caution which would suggest themselves to a mind of reasonable prudence having such knowledge of the danger of dust explosions as the officials of the railroad must be presumed to have had. The mere fact that they had loaded coal with the same machinery and with similar open lights without explosion, and that they had been assured that pitch would load like coal, offers no excuse for the negligence. In loading coal, the dust was kept down with the sprinkler system which was not used in loading pitch; and it is a matter of common knowledge that the danger of explosion in a dust cloud is dependent upon its acquiring the proper density. And the fact that no explosion resulted in the loading of coal is not conclusive that the methods employed were such as in the exercise of due care should have been used even there. Negligent methods of operation do not always or even generally result in disaster. The inquiry is, not whether a method of operation has been used without disastrous results, but whether it is of such a character

that danger of injury is reasonably to be apprehended from its use. Where the element of danger is present, successful operation is to be deemed "fortunate rather than prudent."

And we think that knowledge of the fact that it was dangerous to use the sparking machinery and the open lights around the pitch dust was directly brought home to the officials of the railroad in charge of the loading. Just four days before the explosion, while pitch was being loaded on another vessel, pitch dust on the collector rings of one of the trimmers was ignited by electricity, and directions were given that the collector rings be thoroughly blown out, the statement being made in the written directions that "they get full of that pitch and flash between them." And on this vessel, about four hours before the explosion, there was an igniting of dust around the collector rings and a flash of yellow smoke. While these incidents did not result in an explosion, they should have put the officials in charge of the loading on notice of danger. And the foreman, Rice, seems to have had an idea that danger was present, for, when he sent the stevedores in with the open lights, he cautioned them to be careful, as the "stuff," meaning the pitch, was dangerous.

The railroad company, then, undertook the loading of the pitch on the vessel, having held itself out through its published tariffs as qualified to perform this service. It had absolute control of the cargo and of all the details of loading. The explosion occurred because it did the loading in such a way as to create a cloud of dust, and then brought into that dust cloud open lights and sparking electrical machinery. This was negligence because it knew, or in the exercise of ordinary care should have known, that a cloud of carbonaceous dust was likely to explode if an adequate igniting agency were brought in contact with it. The principles of law applicable are elementary, and no citation of authority is necessary. See, however, International M. M. S. S. Co. v. Fletcher (C. C. A. 2d) 296 F. 855; Grayson v. Ellerman Lines (1920) A. C. 466; The Willem Van Driel (C. C. A. 4th) 252 F. 35; Id. (D. C.) 242 F. 285; State of Maryland to Use of Goralski v. General Stevedoring Co. (D. C.) 213 F. 51, 52, Id. (C. C. A.) 219 F. 827; Quaker Oats Co. v. Grice (C. C. A. 2d) 195 F. 441; Barney v. Quaker Oats Co., 85 Vt. 372, 82 A. 113.

It is argued that there can be no recovery in behalf of the vessel, her crew and cargo, because the master observed the manner in which the loading was being done, and knew of the creation of the cloud of dust and the use of the trimmers and the open lights. The answer to this, as pointed out by the court below, is that the loading was in charge of the railroad company, as an independent contractor, and the master had no duty or right of supervision as to instrumentalities adopted and methods used. Atlantic Transport Co. v. State of Maryland (C. C. A. 4th) 259 F. 23; The Satilla (C. C. A. 2d) 235 F. 58; Jeffries v. De Hart (C. C. A. 3d) 102 F. 765; Grayson v. Ellerman Lines (1920) A. C. 466.

The duty rests upon the master, of course, to see that cargo is properly stowed so that the vessel will be seaworthy. The instrumentalities used for loading and the methods of work, however, are matters within the control of the contracting stevedore. In the absence of some showing that the master directed the use of negligent methods, expressly approved them, or consented to their use, we know of no principle upon which the stevedore can be absolved from liability to the vessel for negligence in using them. The stevedoring company owes to the vessel and her owners the duty of using due care in the loading; but the vessel and her owners owe no such duty to the stevedoring company. See opinion of Lord Birkenhead in Grayson v. Ellerman Lines, supra. Negligence can be predicated only of failure in performance of duty, and the negligence is his to whom the duty appertains. The mere fact that an injured party may have had knowledge that negligent methods were being used does not, in the absence of contributory negligence, absolve the one guilty of such negligence from liability therefor.

As to the injured stevedores, it is contended that they assumed the risk of their injury, and for that reason cannot recover; but this contention manifestly cannot be sustained. There is nothing to show that these illiterate laboring men knew or appreciated the danger of the situation when they were negligently sent into a place which the master, because of superior opportunities of knowledge, should have known to be dangerous. "Assumption of risk does not cover those unseen or obscure dangers which cannot reasonably be discerned by an employee and which the employer properly may be held to know about." 18 R. C. L. 686; Crimmins v. Booth, 202 Mass. 17, 88 N. E. 449, 132 Am. St. Rep. 468; Promer v. Milwaukee, etc., R. Co., 90 Wis. 215, 63 N. W. 90,

48 Am. St. Rep. 905; Galveston, etc., R. Co. v. Garrett, 73 Tex. 262, 13 S. W. 62, 15 Am. St. Rep. 781. And the employee does not assume risks due to the negligence of his employer unless they are obvious or fully known and appreciated by him. Waldron v. Director General (C. C. A. 4th) 266 F. 196; Erie R. Co. v. Collins (C. C. A. 2d) 259 F. 172; Choctaw, etc., R. Co. v. McDade, 191 U. S. 64, 68, 24 S. Ct. 24, 48 L. Ed. 96; Texas & Pac. R. Co. v. Archibald, 170 U. S. 665, 673, 18 S. Ct. 777, 42 L. Ed. 1188.

█ As to the Lewis Company, the manufacturers of the pitch, we think that the court below properly dismissed it from the case. While there is some evidence that the pitch which it manufactured had a higher volatile content than certain other pitch handled by the railroad, there is no evidence that this rendered it or the dust created in handling it any more dangerous than any other pitch or pitch dust would have been. Pitch is not a dangerous substance, and there was no dangerous or vicious quality connected with this particular pitch which it was incumbent upon any one to communicate. Pitch dust, as we have seen, is dangerous just as is any other carbonaceous dust; but there is no more duty upon a manufacturer or shipper of pitch to communicate this fact than there would be upon a shipper of grain to communicate the fact that grain dust is explosive. The dust is not a vice of either pitch or grain. It is stirred up by the manner in which the pitch or grain is handled; and a shipper or manufacturer has the right to assume that a carrier or stevedoring company is familiar with the danger inherent in clouds of carbonaceous dusts and will protect against them accordingly.

The decree below will be affirmed in so far as it dismissed the Lewis Company from the case and in so far as it dismissed the cross-libel, but will be reversed in so far as it dismissed the libels filed against the railroad company; and the cause will be remanded for further proceedings in accordance with this opinion.

Reversed in part, and remanded.

NOTE.—Judge GRONER, who sat in the hearing of the case, concurred in the conclusion expressed in the foregoing opinion, but, because of his appointment to the Court of Appeals of the District of Columbia, and consequent removal from the Fourth Circuit, did not participate in the preparation of the opinion or in the decision.