INTERNATIONAL MERCANTILE MARINE CO. v. FELS et al.

(District Court, S. D. New York.   June 6, 1908.)

1. EXPLOSIVES—EXPLOSION IN HOLD OF VESSEL—EVIDENCE AS TO CAUSE CONSIDERED.

Respondents shipped from Philadelphia to Liverpool about 75,000 pounds of "naptha" soap contained in 1,000 boxes, each box containing 10 cartons, and each carton 10 cakes of soap, each wrapped in a piece of oil paper and of common paper. The soap contained from 6 to 9 per cent. of chemically free naphtha, which would slowly evaporate into the air. The shipment was stowed with other cargo in a hold having two four-inch ventilators; the hatch remaining closed during the voyage. The shipment was made in the summer, and the temperature of the hold was from 60 to 80 degrees Fahrenheit. On reaching Liverpool, the hatch was opened, and, after stevedores had gone into the hold, a violent explosion occurred, killing and injuring a number of men and doing a large amount of damage to the ship. It appeared that naphtha vapor, when mixed with air in the proportion of from 2 to 5 per cent., forms a highly explosive mixture when coming in contact with any igniting substance. *Held*, on the evidence, which disclosed the presence of no other explosive substance in the hold, that the explosion was caused by the vapor given off by the soap.

2. SAME—LOSS FROM DANGEROUS CARGO—LIABILITY OF SHIPPER TO CARRIER—NEGLIGENT STOWAGE.

Respondents at various times shipped in steamships of libelant's line consignments of "Fels Naptha" soap, having such name on the boxes and all other packages. They had also previously notified libelant's agents that the soap contained naphtha, and that there might be danger of explosion if it were placed in a confined space, and had arranged that shipments should be stowed in a place where there was a free circulation of air. *Held*, that libelant was advised, both by the name and by such notice, of the character of the commodity, and of the necessity of properly handling it, the danger of an explosive mixture being formed by the air and naphtha vapor being a matter of common knowledge, and that, in stowing a shipment in a confined hold without proper ventilation, it assumed the risk, and could not hold respondents liable for the damages caused by an explosion resulting.

In Admiralty.

Robinson, Biddle & Benedict, for libelant.

Frank P. Prichard and Archibald Cox, for respondents.

ADAMS, District Judge.   The International Mercantile Marine Company, the owner of the steamship Haverford, brought this action against Joseph Fels and Samuel S. Fels to recover the damages, which resulted from an explosion in the No. 3 hold of the said steamer as a result of vapor emitted from a shipment of 1,000 boxes of soap, weighing 90,000 pounds, for which a bill of lading was issued to the respondents containing, inter alia, the following clause:

"3. Also that shippers shall be liable for any loss or damage to steamer or cargo caused by inflammable, explosive or dangerous goods shipped without full disclosure of their nature, whether such shipper be principal or agent; and such goods may be thrown overboard or destroyed any time without compensation."

The libel further alleged that the said soap was manufactured by the respondents and known in the trade as Fels Naptha soap and con-

tained a high percentage of chemically free naphtha and the explosion took place as a result of vapor emitted from the soap, in combination with the air coming in contact with fire or with a spark. It was further alleged that the said damages were not caused or contributed to in any way by the libellant, its agents, servants or employees, who had no knowledge or notice of the dangerous character of the said soap, but were caused solely by the negligence of the respondents, their agents, servants or employees as follows:

"1. In offering for carriage in an enclosed space on said Steamship soap manufactured by them containing a large amount of chemically free naphtha likely to be given off during the voyage and to make, with the air, a highly explosive combination.

2. In not informing your libellant of the dangerous character of said soap when it was offered for shipment.

3. In not informing your libellant of the precautions proper to be taken to prevent the occurrence of an explosion due to the composition of the said soap.

4. In not informing your libellant that the said soap emitted or was likely to emit a vapor which with a certain admixture of air, would make an inflammable compound liable to explode on coming in contact with fire or with a spark."

The libel further alleged that by reason of the explosion, damage was done to other cargo stowed in the steamer and she herself sustained serious damage, and that the libellant has been compelled to pay a considerable sum of money under the Workmen's Compensation Act of Great Britain in settlement of claims of its servants injured and killed, and the amount of the damage sustained by the libellant is the sum of $100,000.

The answer denied that the soap contained a high percentage of chemically free naphtha, admitted the shipment and the explosion, denying, however, that the explosion was the result of vapor emitted from said soap in combination with air coming in contact with fire or with a spark. The answer denied the allegations of freedom from negligence on the libellant's part and of negligence on their part and alleged further:

"Respondents are manufacturers of a soap, which does contain as one of its ingredients, a small percentage of naphtha. This soap is named 'Fels Naptha Soap,' and is so designated in conspicuous type on all interior and exterior wrappings and boxes, and the fact that it does contain naphtha is thus made publicly known to every one who handles it. Soap identical in all respects, including the amount of naphtha ingredient with the soap on the Haverford at the time of the explosion, has been manufactured by respondents for very many years prior to the filing of the libel in the present case, and has been sold in very large quantities and is a staple and well known article of commerce. It has been stored in warehouses and rooms, and shipped on cars and vessels in very large quantities, and under many different conditions of temperature and ventilation and had never been known to produce any vapor causing explosion. Said soap is not in fact inflammable, explosive or dangerous goods. The amount of said soap shipped upon the Steamship Haverford, was about seventy-five thousand pounds, and was not an unusual quantity to be shipped on a vessel, nor had respondents any notice that it was likely to be stored in a space not properly ventilated or not ventilated as a space in a ship should be to render that ship seaworthy for the transportation of such soap, or under conditions which would be likely to produce any unusual combination of air with naphtha. Said soap did not contain a large amount of chemically free naphtha, likely to be given off during the voyage and to make with the air a highly explosive combination. Respondents did make full disclosure to

libellant of the nature of the said merchandise, which at the time of said shipment was known to libellant, but the said merchandise was not inflammable, explosive or dangerous merchandise. So far as was known to respondents, there were no special precautions to be observed in the shipment and carriage of the said merchandise other than the proper ventilation of the compartments of a vessel in which are carried any substance containing a naphtha or similar ingredients. The said merchandise was not likely to emit a vapor, which with an admixture of air, would make an inflammable compound, liable to explode on coming in contact with fire, or with a spark. Nor had respondents any reason to suppose that fire or spark would be allowed in the compartment in which the soap had been stored. On the contrary, the fact that the goods had been for many years manufactured, stored and shipped without any such explosion, shows that it was not likely to cause such an explosion, and on information and belief, respondents aver that it did not cause the explosion in the present case. Respondents aver that the said explosion and any damage consequent thereon were not caused by the negligence of the respondents or either of them, their agents, servants or employees, and on information and belief respondents aver that the said explosion and the damage consequent thereon were caused solely by the negligence of the libellant, its agents, servants or employees."

The respondents then alleged that they had no knowledge of the remaining charges in the libel and required proof if they should be material.

The testimony shows that on or about June 2, 1906, the steamer sailed from Philadelphia to Liverpool; that prior to sailing there had been loaded in No. 3 lower hold a shipment of 1000 boxes of the respondents' soap, for which the above mentioned bill of lading was duly given. Each cake of soap was wrapped in a piece of oil paper, then a piece of ordinary wrapping paper upon which there was certain printed matter. Ten cakes of the soap were then placed in a carton, which was a heavy paper box with flaps at each end which were closed after the soap was put in. Ten of these cartons were then packed in a wooden box, $27^{7}/_{8}$ inches long, 14 inches wide and $7^{7}/_{8}$ inches high. Neither of the cartons nor the wooden box were air tight but would, together with the paper wrappings, retard the giving off of vapor by the soap. The gross weight of the shipment was about 75,000 pounds; the net weight of the soap being about 69,300 pounds. The soap was stowed in No. 3 lower. hold. Forward of this hold, but separated from it by a steel bulkhead, was No. 2 lower hold. Just aft of No. 3 lower hold, but separated from it by a steel bulkhead, was No. 4 deep tank. On the deck above No. 3 lower hold was a refrigerating room but on this voyage nothing was in that room. The hatch to No. 3 hold was just forward of No. 4 deep tank, and its dimensions were about ten feet by twelve. There were two ventilators, about 4 inches in diameter, leading to No. 3 hold.

Besides the soap there were stowed in No. 3 hold barrels of lubricating oil and paraffin scale or wax and some oak staves. The oil barrels were stowed in the bottom of the hold all the way across the ship. Above these on the port side were stowed the boxes of soap, and on the starboard side were the paraffin or wax barrels. The staves were used as dunnage.

The cubical contents of No. 3 hold were 30,400 cubic feet. It was stowed about one-half full, so that the free air space was about 15,000 cubic feet. The boxes of soap occupied about 1,800 cubic feet.

The temperature of the air during the loading and the voyage was the ordinary summer temperature; that is, between 60° and 80°. The temperature of the water, was also the usual summer temperature, varying from 50° to 80°. The temperature of the hold at the time of the explosion was between 60° and 80°.

The hatches were on No. 3 hold during the voyage across. What ventilation it received was from the ventilators mentioned above and from such air as entered through the hatch openings, which were not sealed and admitted some air.

The steamer arrived in Liverpool June 13, 1906, but the hatches in No. 3 hold were not opened during that day. The next morning, about 7:20 o'clock, the stevedores removed the said hatches preparatory to discharging No. 3 hold. After the hatches were off the men went into the hold for the purpose of discharging the cargo therein. Very shortly afterwards, a very violent explosion occurred. Thirteen men were killed, a number were injured and a large amount of damage was done to the ship. The bulkhead between No. 2 and No. 3 holds was blown forward at the top about four feet. There was a large rent made in the bulkhead in the starboard corner and also one near the middle. The whole deck above was lifted and a large rent made in it near the starboard forward corner of No. 3 hold and extending some five feet into No. 2 hold. The cargo in both holds caught fire and this fire was with difficulty gotten under control.

The action was brought not only upon an alleged common law liability of the shippers but upon the contractual liability contained in the clause of the bill of lading quoted above, and the questions of fact to be determined are:

First. Was the explosion caused by vapor given off by the soap?

Second. Did the respondents make full disclosure to libellant of the nature of the soap or was it otherwise aware of it?

First. That the soap contained a quantity of naphtha is practically undisputed. It was variously estimated, after analyses of the soap, to have been from 6% to 9% of chemically free naphtha. The analyses so showed and there can be no doubt, I think, that notwithstanding the wrappings, the soap did give off a vapor, which, when mixed with air in proper proportions was highly explosive, upon being brought in contact with an igniting power, a flame for example, or a spark of high intensity.

It appears that the naphtha was the only commodity in the hold that was of an explosive nature, and in view of the explosion that took place, which was of such a character as might readily have been produced by naphtha, it does not seem that the fact of there being no definite proof of the manner of ignition, should prevent the only rational explanation of the explosion being adopted, without regard to the details.

The respondents urge, and their contention is supported by eminent experts, that the fumes of naphtha could not have caused such an explosion as took place, but the fact remains that the explosion did occur and that there is no other reasonable explanation of it save from the effects of the naphtha. I do not think that the attempted solution by testimony

of the probable presence of a high explosive, dynamite for example, is sufficient to overcome the actual presence of the naphtha and its explosive character. Not very persuasive testimony was given concerning the remains of an infernal machine found in the hold, but if such were there, which seems to be in some doubt, it is not enough to remove the plain explanation of the trouble from the naphtha.

It is sought by the respondents to show that there was too much ventilation in the hold to allow of the adoption of the libellant's theory of the naphtha cause; but while there was some ventilation there, it was evidently not sufficient to carry off all the vapor. The expert testimony shows that naphtha will only cause an explosion where the vapor is from 2% to 5% of the air. Above and below such a proportion, it will not explode, but burn quietly. The ventilation in this hold was doubtless sufficient to bring the quantity of vapor within the limits mentioned.

There has been a great deal of expert testimony with reference to the probable or possible ignition of the naphtha vapor but in considering it, we are, more or less, relegated to a realm of conjecture, which it is not necessary to explore. I think from the facts above stated, it is fairly to be concluded that the naphtha caused this explosion and requires an affirmative answer to the first question.

Second. It remains to be considered whether the respondents should be held liable for the results of the disaster.

This soap was first manufactured by the Stanton Manufacturing Company. The respondents commenced the sale of it in 1892, and its manufacture in 1894. Their shipments, storage and sales have been very extensive. They sold during their connection with it, and prior to June, 1906, between six hundred and seven hundred millions of cakes. It is shipped to all parts of the United States and to England. The output of their factory in Philadelphia is about fifteen carloads a day. At the time of the shipment on the Haverford it was neither a new article of manufacture or of marine shipment. It had been extensively sold and advertised and had been for many years shipped on lines of steamships, some of which at the time of the explosion were operated by the libellant.

The soap itself was not dangerous, inflammable or explosive. It contained, however, naphtha, which slowly evaporated into the atmosphere. Naphtha is an article which, either in liquid or gaseous form, is within common knowledge a dangerous substance, and is so mentioned in the laws of the United States. Sections 4472–4476, U. S. Rev. St. (U. S. Comp. St. 1901, pp. 3050–3052).

Under ordinary conditions of shipment or storage, such as storage in ordinary warehouses without special ventilation, shipment in closed freight cars, without special ventilation, and all the ordinary methods of shipping, handling, storing in warehouses, stores and in dwellings while awaiting consumption, the vapor gives off so slowly that it does not accumulate or combine with air in sufficient quantities to be dangerous. Prior to the explosion on the Haverford, no fire or explosion was ever known to have been caused by the soap, although it had for many years been shipped, stored, handled and used by manufacturer,

carrier, warehouseman, jobber, retail dealer and consumer under a great variety of conditions.

In 1900, Joseph Fels called on P. F. Young, now the libellant's Philadelphia manager and then the manager at Philadelphia of the Atlantic Transport Line, a line now operated by the libellant, to arrange about the shipment of large quantities of soap abroad and to ascertain what ventilation would be furnished. Mr. Fels then told Mr. Young that the soap contained naphtha, that the fumes thereof were given off slowly and that if the soap were confined in a space without ventilation there might be some trouble from explosion and that while the respondents did not expect anything of the kind, they wished to guard against it. Mr. Young after considering the matter, wrote a letter declining to carry the soap. This letter was as follows:

"Philadelphia, February 13th, 1900.

Messrs. Fels & Co.,
    No. 1710 Market Street,
        Philadelphia, Pa.

Gentlemen:—

Referring to conversation had with your Mr. Fels at this office, the writer regrets that absence from the City prevented his keeping the appointment made with you to go down on board the s/s 'Maryland' before she sailed; the s/s 'Maryland' sailed yesterday.

As regards our carrying this Soap, we have given the subject quite a little thought and have come to the conclusion that we would prefer not to carry it.
    Yours truly,                                   P. F. Young, Phila. Manager."

A few days later another letter was written by Mr. Young to the respondents as follows:

"Philadelphia, February 16th, 1900.

"Messrs. Fels & Co.,
    No. 1710 Market Street,
        Philadelphia, Pa.

Gentlemen:—

We have yours of the 15th instant, asking the writer to stop at your Office today or tomorrow, and he would be very glad to do so if there was anything to be gained, but we have already written you that we have decided not to carry on our Steamers Fels' Naptha Soap, as described by you, so we don't think anything can be gained by further discussion of the subject.

If at any future day we change our minds, we will be very glad to at once communicate with you.
    Yours truly,                                   P. F. Young, Phila. Manager."

Mr. Young at first denied he had received any notice of the dangerous character of the soap, but upon the letters being shown him he said:

"Redirect examination by Mr. Montgomery:

Q. What in reference to these letters did Messrs Fels & Company tell you about the nature of the soap at the time the letters were written by you, as manager of the Atlantic Transport Company? A. It is only proper that I should say, in connection with these letters, and my previous statement that I had no recollection of having had any conversation or any communication with Fels & Company in regard to naphtha soap, that a good many letters were written within the period from 1900 to 1908, and these letters had escaped my memory; in answer to your question, Mr. Montgomery, I now recall that with the production of those letters, Mr. Fels, I don't remember

which one it was, called at the office and made a request for a separate compartment to be designated on board the Maryland, a small freight steamer, not in any sense a passenger or modern steamer; in fact, it was the first steamer the Atlantic Transport Company ever built; I told him that I could not see that there was any business in that; neither did I see any necessity; as I recall Mr. Fels' reply was, 'What is naphtha soap?' I think I said, 'I think it is very much like an advertisement in any event we cannot contract with you to carry the specific quantity described,' the capacity of the compartment being greatly above his measurement, in carrying soap; as my memory serves me that was the conversation; I do not recall anything that was said in regard to this dangerous cargo, beyond what I have recited.

Q. Nothing was ever said to you thereafter about this being dangerous or inflammable? A. Nothing; I have no recollection of any conversation other than the one I have just described.

Q. Your objection was on the ground that Mr. Fels wanted a compartment in the ship separate and apart for the soap? A. Exactly.

Q. You did not care to let a contract that way? A. Not unless the shipper agreed every voyage of that ship to furnish the capacity of that compartment so assigned.

Q. Did Mr. Fels agree to that? A. He did not.

Q. Did you make any investigation of the soap afterwards? A. No, sir, we did not make any investigation of the soap afterwards because I never thought it had any dangerous qualification to it, as I thought it was an advertisement, the words 'naphtha' the same as monkey soap is an advertisement neither of which, as far as I know contain naphtha or monkeys, and I therefore was not serious in the matter.

Q. Was the Atlantic Transport Company at that time, of the writing of the letters, a part of the International Mercantile Marine Company? A. No sir.

Recross-examination by Mr. Cox:

Q. How distinct is your recollection of your interview with Mr. Fels? A. It is as distinct as I have described it.

Q. I notice in the letter Respondents' Exhibit B you speak of Fels' Naphtha soap as described by you? A. Yes.

Q. Do you remember to what that referred? A. As I just previously said, my recollection is that Mr. Fels rather wanted to give me the impression that it had naphtha in it.

Q. Don't you think he distinctly gave you that impression? A. No, he did not give me that impression; he gave me his views on it, but he did not give me that impression.

By the Court: Q. Do you mean from what he stated? A. He stated, as I remember, that it had naphtha in it, but I do not recall that Mr. Fels stated that it had a dangerous percentage of naphtha in it, and if I am not entirely wrong Mr. Fels illustrated that it was not a dangerous commodity, by sending out one of my office boys—it comes to me just as I am talking—and bought some four or five packages of soap.

Q. Of this soap? A. Fels Naphtha soap, and sought to ignite it or bring out a flame or odor or something of that kind from the applying of the match but it was not any different in that connection from ordinary soap, as far as I could see.

Q. What effect did the match have? A. As far as I saw, and I remember Mr. Fels' conversation with me, he did not say it brought any fumes or any light of any description.

By Mr. Cox: Q. Notwithstanding Mr. Fels' statement that the soap contained naphtha, did you still think the name 'naphtha' was merely a name? A. There are two different shipments of soap, and two different kinds; I merely mentioned that as I did to describe it; but I did not think Fels Naptha soap contained any naphtha worth considering, as a result of my conversation with Mr. Fels at that time.

Q. What reason do you remember that Mr. Fels gave for wanting a separate compartment? A. I can't remember that; I think though it was ventilation, but I don't recall it."

Mr. Fels gave the following account of his conversation with Mr. Young:

"I said Fels-Naphtha soap contained naphtha; certain portions of the vapor from naphtha—Fels-Naphtha soap were given off slowly and if the soap was confined in a narrow space without ventilation there might occur some trouble, and explosion, and while we were not looking for anything of that kind, we wanted to do whatever we could to guard against it."

I think the foregoing tends to corroborate Mr. Fels' version of the matter.

Mr. Bettle, a witness for libellant, was connected with the American Line before July 1st 1904, with an office in New York. He was general freight agent for the line to which the Haverford belonged. He said that he did not know the soap was being carried but that a shipper in Philadelphia would approach the East Bound Freight Agent and that he (Bettle) would be consulted by such agent, who was a Mr. McKinstry. Mr. Joseph Fels testified that he went to see Mr. Mr. McKinstry and stated to him:

"Q. What did you tell him about the soap, if anything? A. I said to him that Fels-Naphtha soap was—we were about opening a trade abroad, and I wanted to come down to see him in order that the American Line as well as every other steamship line which we offered business to should know just the character of goods we were shipping, in that it contained naphtha which would give off vapors, especially in confined places, and that though we had never had any trouble since we were in the business about any explosion or fires, but that with the use of naphtha we wanted to run no risk, and would prefer not to do any business unless it was thoroughly understood by those people who should receive the goods, meaning the transportation companies; I further stated that we could not ship the goods at all unless there was proper ventilation on the boat, by reason of the fact that some trouble might occur and that there might be an explosion by reason of the confined vapor."

Mr. McKinstry in speaking of the interview with Mr. Joseph Fels, said:

"Q. Will you kindly state what it was he said to you about it? A. Well, he told me the other lines had refused to carry it; some of these lines had refused to carry it on account of its having a percentage of naphtha in it, and that there was disposition to suppose that there might be danger connected with it, and they had refused to take it; he did not want us to take it under a misapprehension; he said the soap gave off some fumes, or vapor, or something of the kind, and in a confined space something might happen, but that it was carried on box cars on railways, and in a ventilated space the probabilities were nothing could happen. * * *

A. On account of the possibility of the fumes in a confined space, resulting in something.

Q. Did he use the word something? A. No; that it might be dangerous to have the fumes confined; whether that something was explosion or flames I don't know."

Mr. Fels also said:

"Q. Did Mr. McKinstry say anything about providing space where there would be ventilation? A. He did.

Q. What was it? A. He offered us the cattle deck.

Q. Did he say how much ventilation there was there? A. He said practically the cattle deck is practically equal, so far as all intents and purposes are concerned, to the outside."

Mr. McKinstry on the 25th of August, 1902, sent a telegram to one of his superiors in which he inquired, referring to the soap: "Would you consider it a dangerous product in any sense of the word?" Mr. McKinstry understood the soap was to be carried in a fully ventilated place. Mr. Fels reported the interview with Mr. McKinstry to his office and in consequence measurements of a box of soap were sent to Mr. McKinstry. He replied:

"We have your yesterday's favor, giving figures on your soap. We quote the rate of 10/– and 5% primage per 2240 lbs., Philadelphia to Liverpool, per S. S. Haverford appointed to sail hence Sept. 20th. Please advise us if you wish us to reserve room."

Mr. Collingswood, a clerk in the employ of the respondents, made a pencil memorandum on the letter as follows:

"1,000 provided it is compartment on cattle deck between two cattle compartments."

The respondents sent a letter to the International Navigation Company on September 17, 1902, as follows:

"We enclose bill of lading for 1093 boxes of Fels-Naptha soap shipped by Pa. R. R. to your Washington Street Wharf. Two cars. These goods are intended to go on the S/S 'Haverford,' in the compartment arranged for by us. Please advise us when we can get bill of lading for same."

The words the "compartment arranged for by us" can only refer to the arrangement between Mr. Fels and Mr. McKinstry.

Mr. Samuel S. Fels saw Mr. McKinstry in December, 1902, and was informed that the company was taking pains to carry the soap in the decks.

The libellant's cargo superintendent, in writing to the respondents November 24, 1902, said:

"The smell arising from this soap resembles very much naphtha, but it quickly passes away when exposed to the air, but when confined below without good ventilation becomes very offensive, and I am quite satisfied that it will very seriously damage flour or anything of that nature that might be stowed with it; otherwise, I do not consider it a dangerous commodity, and I see no reason why it should not be carried if care is taken to give it proper storage."

Mr. Wallace, the dock superintendent for the libellant, said, referring to Mr. McKinstry:

"Q. He has told us here that he spoke to you, or someone, he couldn't be sure who, stating that the soap ought to be stowed in the between decks. A. That must have been me, because he wouldn't speak to anybody else.

Q. You wouldn't doubt that he told you that? A. I won't say that he didn't tell me; he might have done it; if he says he said so I guess he did; but I don't remember."

I fail to see how there can be any doubt that the respondents sufficiently informed the libellant of the character of the goods they were shipping.

Apart, however, from notice by the respondents, the packages themselves gave notice of the character of the goods. The packages have been described herein and they advised any one who saw them that they contained a possibly dangerous commodity. When the libellant handled the goods as though they were absolutely harmless, it took the risk in-

volved. The Supreme Court has said in this connection (Wood v. Carpenter, 101 U. S. 135, 141, 25 L. Ed. 807):

" 'Whatever is notice enough to excite attention and put the party on his guard and call for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it.' Kennedy v. Green, 3 Myl. & K. 722. 'The presumption is that if the party affected by any fraudulent transaction or management might, with ordinary care and attention, have seasonably detected it, he seasonably had actual knowledge of it.' Angell, Lim. § 187 and note."

The proper place for notice was on the packages themselves and when the respondents published in such way the fact that the soap contained a notoriously dangerous ingredient, it seems that they fulfilled their duty to this carrier, which could not supinely assume that the notice meant nothing. In addition to the fact heretofore alluded to that naphtha is pronounced a dangerous commodity by the U. S. Statutes, it is a notorious fact that such article is explosive. Prof. Munroe testified:

"Q. It has been suggested in the testimony here that while the word n–a–p–h–t–h–a might afford notice of the fact that the goods were possibly explosive or might give off gases, the word naptha would not; what do you think of that? A. I have had occasion to deal with the matter officially, and in many of the reports which 1 have received in my work for the United States Census Bureau, these being reports from all the individual makers, where they had occasion to make use of the lighter petroleum distillate, they have spelled the word n–a–p–h–t–h–a and n–a–p–t–h–a, and there was no doubt as to what was meant; it was the slight petroleum distillate.

Q. Can you state from your experience whether or not it has long been common knowledge that naphtha gives off vapors? A. Yes.

. Q. Can you state whether or not it has long been a matter of common knowledge that naphtha is a dangerous substance on account of its inflammable and explosive qualities., A. It has; as long ago as the time of Pliny.

Q. More conspicuously recently? A. More particularly since 1871, since the work of Professor Chandler done here in the city of New York upon dangerous kerosenes, that work being done for the Board of Health and published widely, has been widely circulated through literature, and widely commented upon in the newspaper press, particularly in connection with the accidents that have occurred from the light petroleum distillates."

The use of the word "naptha" was notice that the goods at least required special care. Doherr v. Houston (D. C.) 123 Fed. 334, 335, affirmed 128 Fed. 594, 64 C. C. A. 102.

The libellant had in fact knowledge that the commodity it was handling was naphtha from its very strong smell. It was accustomed to testing the air of the compartment in which it was stowed before allowing the workmen to go there. The Liverpool agents of the line advised their correspondents in Philadelphia not to stow the soap under other cargo as it would so affect the men that they would act as if drunk. It was well known to the Liverpool agents of the line that the strong smell existed in connection with the soap and that smell could only mean the presence of naphtha. It was a matter of common knowledge that the accumulation of naphtha vapor in connection with air created a dangerous and explosive compound.

I think that the failure of the libellant to properly provide for the transportation of the soap with respect to ventilation, was the proximate

cause of the explosion.   It would only occur under very exceptional
circumstances but the failure to provide for such circumstances was
at the libellant's, not the respondents', risk.   The latter felt it incum-
bent upon them to notify the libellant that there was a possibility of
danger and when they gave the notice alluded to herein, they discharg-
ed themselves from liability.   If they had not given such notice, it is
probable that the notice from the markings on the packages and the
other indications of the presence of naphtha, would have been sufficient
to make the libellant responsible for the effects of the explosion. Doubt-
less the libellant and its predecessors had become so accustomed to
carrying the soap with safety that they failed to be impressed with the
possible danger and when it stowed the goods in a hold of the vessel,
where there was only partial ventilation, just enough to create perilous
conditions, a situation resulted from which the accident ensued.

The second question is answered in the affirmative.

It follows that the libellant can not succeed and that the libel must
be dismissed.